IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Cliff Sweet,                              :
                Plaintiff                Civil Action 2:11-cv-1151
                                          :
    v.                                   Judge Marbley
                                          :
Michael J. Astrue,                        Magistrate Judge Abel
Commissioner of Social Security,          :
             Defendant

**REPORT AND RECOMMENDATION**

Plaintiff Cliff Sweet brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying his applications for Social Security Disability and Supplemental Security Income benefits. This matter is before the Magistrate Judge for a report and recommendation on the administrative record and the parties' merits briefs.

**Summary of Issues.** Plaintiff Sweet maintains that he became disabled, at age 36, due to a back injury and neck injury. (*PageID* 221.) He was 38 years old at the time of the hearing before the administrative law judge. The administrative law judge found that Sweet retains the ability to perform a reduced range of work having light exertional demands. (*PageID* 44.)

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

•    The administrative law judge failed to use the appropriate legal standards in the evaluation of plaintiff's credibility.

• The administrative law judge failed to evaluate plaintiff's IQ deficits as a severe impairment.

**Procedural History.**  Plaintiff Sweet filed his application for disability insurance benefits on July 13, 2009 and supplemental security income on September 29, 2009, alleging that he became disabled on July 13, 2009.  (*PageID* 155-58, 159-62.)  The applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On May 20, 2011, an administrative law judge held a video hearing at which plaintiff, represented by counsel, appeared and testified.  (*PageID* 63-85.)  A vocational expert also testified.  (*PageID* 86-95.)  On June 17, 2011, the administrative law judge issued a decision finding that Sweet was not disabled within the meaning of the Act.  (*PageID* 40-51.)  On October 25, 2011, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (*PageID* 32-34.)

**Age, Education, and Work Experience.**  Sweet was born February 23, 1973.  (*PageID* 50, 217.)  He has high school education attending special education classes.  He also obtained his CDL through truck driving school.  (*PageID* 181-216, 255.)  Sweet previously worked as a construction laborer, forklift operator, technician at a car dealership, over the road truck driver and water blaster in the industrial services industry.  (*PageID* 222.)

2

**Plaintiff's Testimony.**  The administrative law judge fairly summarized Sweet's statements and hearing testimony as follows:

> The claimant appeared at his hearing and provided sworn testimony regarding his physical impairments.  He testified that he had difficulty with steps, held a commercial driver's license, but could not drive because his right leg had been numb for a period, and that he sat in the car for forty-five minutes for the drive to the hearing.  He further testified that he had significant pain in his back and neck, he could walk about twenty feet before needing a rest period, could stand in one place for fifteen to twenty minutes before needing to sit for at least forty-five minutes.  The claimant also testified that he had requested surgery for his back in the past but that the surgeon had stopped taking his insurance and that he will be seeing a surgeon in the future for spinal fusions.  Regarding his knee, the claimant stated he experienced popping and cracking and it causes him pain if he stands on it for a while.  He testified that he experiences similar problems with his right shoulder.  The undersigned inquired about the claimant's activities of daily living and the claimant stated he was able to sit down and watch movies, could walk to get around, had difficulty fishing, cooked once per week, and did not do yard or household chores.  The undersigned asked the claimant whether he believed he could work at a job that allowed him to sit or stand whenever he wanted without heavy lifting.  The claimant responded he did not think he could because sometimes his legs go numb and he felt like passing out and seeing black spots.

(*Page ID* 48-49.)

**School Records.**  When plaintiff was enrolled at Fairfield County Schools, an Individualized Education Plan ("IEP")[1] was prepared for the 1982-83 school year. (*PageID* 215-16.)  Plaintiff was in a program for developmentally handicapped students.

An evaluation team report prepared when Sweet was in the fourth grade showed an IQ of 73.  (*PageID* 213.)  Plaintiff was referred for evaluation due to his lack of progress in regular classes.  It was noted that Sweet had been phased out of the developmentally handicapped program due the evaluation data obtained from the evaluation team.  (*PageID* 212.)

He underwent a psychological reevaluation in November 1986 when he was thirteen years old as a part of his muitlifactored reevaluation.  (*PageID* 204.)  Sweet scored a Verbal IQ of 67, Performance IQ of 75, and Full Scale IQ of 70 on the Weschler Intelligence Scale for Children - Revised.  *Id.*

In December 1989, when Plaintiff was sixteen, he scored a Verbal IQ of 79, Performance IQ of 76, and Full Scale IQ of 77 on the Weschler Adult Intelligence Scale. (*PageID* 197.)  The evaluator indicated that these scores placed him in the borderline range of intellectual functioning.  *Id.*

---

[1]Under the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, *et seq.,* children who are identified as having a disability are entitled to special education and related services to address their "unique needs and prepare them for further education, employment, and independent living." *See* 20 U.S.C. § 1400(d)(1)(A).  School districts must establish an IEP for each child with a disability.  *See Deal* v. *Hamilton County Bd. of Educ.,* 392 F.3d 840, 853 (6th Cir. 2004).  The IEP must "contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress."  *Deal,* 392 F.3d at 853 (quoting *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 763 (6th Cir. 2001)).

In the IEP for Sweet's senior year, it was noted that Sweet demonstrated deficits in adaptive behavior in the areas of motor skills, social communication, and community living skills.  (*PageID* 181.)

**Medical Evidence of Record.**  The relevant medical evidence of record is summarized as follows:

Colonnade Internal Medicine Group/James Key, M.D.  On April 22, 2009, Plaintiff complained to physician assistant ("PA") Elizabeth Gross of right shoulder pain for the past four days, alleviated by Ibuprofen.  An x-ray was ordered and Sweet was instructed to lose weight.  (*PageID* 445-46.)

On April 29, 2009, Plaintiff complained to primary care physician, Dr. Key of right arm swelling for the past ten days and that Naprosyn only mildly improved his right shoulder pain.  (*PageID* 287.)  Physical examination showed tenderness and pain with abduction of the right shoulder.  Sweet was diagnosed with tendinitis.  A cervical spine x-ray showed mild degenerative disc disease at C6-7.  (*PageID* 298.)

An MRI of the right shoulder taken on May 2, 2009, revealed moderate supraspinatus and infraspinatus tendinopathy and mild AC (acromioclavicular) joint degenerative changes with marrow edema at the AC joint.  (*PageID* 295-96.)

On May 8, 2009, Sweet was seen for chronic tachycardia, hypertension and weight gain/obesity at 366 pounds.  (*PageID* 285-86.)  He had a normal musculoskeletal exam and normal psychiatric findings, including normal thought content, cognition, memory, concentration, abstract thinking, judgment, and insight.  (*PageID* 249.)

On July 13, 2009, Sweet presented to PA Elizabeth Martin with complaints of a sudden onset of acute, sharp, radiating back and neck pain.  (*PageID* 283-85.) Associated signs and symptoms included extremity numbness, headache, limited range of neck motion, and sciatica.  Physical examination revealed tenderness of the cervical, thoracic and lumbosacral spine, decreased flexion and extension of the cervical spine, decreased flexion, extension and bending of the lumbar spine, and tenderness of the right sacroiliac joint.  His upper and lower extremities were normal bilaterally, and he had a normal gait.  Sweet was diagnosed with degenerative disc disease, lumbago and sciatica.  (*PageID* 285.)  MRI's of Sweet's spine were ordered and he was placed on a Prednisone taper.

A lumbar spine MRI taken the following day showed mild degenerative disease, especially at L1-2, L4-5 and L5-S1.  There was no herniation or stenosis.  (*PageID* 300-01.) An MRI of Sweet's cervical spine taken on July 15, 2009 showed a bulging disc and posterior osteophytes at C6-7 causing mild central and left paramidline stenosis with neural foraminal due to bony overgrowth worse on the left than the right.  It also showed a small central and right paramidline disc protrusion at C5-6 causing mild central stenosis without compressing the spinal cord.  (*PageID* 322-23.)  An MRI of the thoracic spine, obtained the same day, showed degenerative disc changes and anterior osteophyte formation in the lower thoracic spine.  (*PageID* 324.)

In July 2009, PA Martin reported that she had treated Sweet since November 2008.  She listed his medical conditions as essential hypertension, tachycardia,

osteoarthritis, degenerative intervertebral disc disease, sciatica, lumbago, obesity, tendinitis, hyperlipidemia, and reflux disease. PA Martin opined that Sweet required medication and would possibly require back surgery in the future. She reported that Sweet was limited in sitting, standing and walking, could frequently and occasionally lift twenty-one to twenty-five pounds, was not significantly limited in repetitive foot movements or handling, and was moderately limited in reaching, bending, and pushing/pulling. PA Martin concluded that Sweet was not employable. (*PageID* 318-19.)

On August 18, 2009, Sweet presented to PA Gross with complaints of worsened back pain and sciatica. He "[w]ould also like a letter stating he can no longer drive [due to] his leg going [completely] numb." (*PageID* 436.) Examination revealed normal clinical findings in his upper and lower extremities bilaterally and normal gait and station, but PA Gross found thoracic and lumbar spine tenderness, decreased flexion and extension, decreased lateral bending, and positive straight leg raising. PA Gross also reported that Sweet exhibited normal thought content, cognition, memory, concentration, abstract thinking, judgment, and insight. Sweet's Tramadol and Naprosyn were continued, a Prednisone taper was added he was referred to Dr. Masone for injections. (*PageID* 437.)

On October 6, 2009, Sweet complained to PA Gross of chronic back pain. PA Gross' examination of Sweet revealed upper and lower extremities were normal bilaterally, and Sweet had a normal gait and station. Sweet also exhibited normal

psychiatric findings.  (*PageID* 434-35.)  On October 14, 2009, Sweet complained to physician assistant Devon Ratchford of ankle edema and lower leg pain that had started one week earlier.  Associated signs and symptoms included decreased range of motion, instability, limping, locking, redness, swelling and warmth.  Sweet also requested a referral to a gastric bypass surgeon.  PA Ratchford recommended that Sweet elevate his legs whenever he rested and use Ace wraps in the morning.  (*PageID* 432-33.)

In January and March 2010, Sweet was seen for edema of both lower extremities.  (*PageID* 384-85, 387-88.)  In April and May 2010, it was noted that Sweet's condition was improving, but the frequency of the episodes was increasing and exacerbated by standing.  (*PageID* 410-12.)  In August 2010, Sweet complained to Dr. Key of bilateral lower extremity edema.  (*PageID* 420-21.)  During physical examination, he exhibited tenderness and decreased flexion in his lumbar spine, but his straight leg raise test, gait, and station were normal.  *Id.*  When seen in September 2010, Sweet's left knee was tender with decreased flexion and extension and pain with flexion.  PA Paul Schoor also found tenderness and decreased flexion of the lumbar spine, edema of the lower legs and ankles, stasis dermatitis, and a limp.  (*PageID* 417-18.)

On February 9, 2011, Dr. Key noted Sweet's complaints of back and neck pain and sciatica.  (*PageID* 491.)  Sweet had a positive straight leg raise test on the right and tenderness in his lumbar spine, but full flexion in his lumbar spine and normal gait and station.  (*PageID* 492.)

8

On February 18, 2011, PA Gross completed a medical source statement as to Sweet's physical capacity.  According to PA Gross, Sweet can lift and carry five pounds, stand and walk less than one hour at a time and in total in an eight-hour day, sit less than four hours at a time and in total in an eight-hour day, rarely climb, balance, stoop, crouch, kneel and crawl, occasionally reach, handle, feel, and perform fine and gross manipulation, and rarely or never push and pull.  He must also avoid heights and moving machinery.  PA Gross also opined that Sweet needed additional rest periods besides the normal breaks provided in a workday, required a sit/stand at-will option.  Sweet also experienced severe pain.  PA Gross reported that Sweet had not been prescribed a cane, walker, brace, or TENS unit but is pending surgery.  PA Gross listed Sweet's medical findings of neck and back pain, decreased range of motion, crepitus, numbness down the leg and numbness and decreased strength of the hands and fingers due to degenerative disc disease with nerve impingement to support of her opinion.  PA Gross concluded that extensive movement can worsen Sweet's condition.  (*PageID* 473-74).

On April 15, 2011, Sweet presented to PA Schoor with "incapacitating" back pain.  (*PageID* 481.)  Examination of the cervical spine revealed tenderness, decreased extension, and decreased left and right lateral bending and physical examination of the lumbar spine revealed decreased flexion and extension, decreased lateral bending, decreased rotation, and positive straight leg raising bilaterally.  (*PageID* 482.)

9

Steven Priano, M.D.  Consulting orthopedic surgeon, Dr. Priano, examined Sweet's right shoulder on May 13, 2009 and found decreased range of motion, pain with internal rotation, tenderness along the AC joint, positive cross arm abduction test, and positive Neer and Hawkin's sign.  Sweet's gait was within normal limits.  Dr. Priano noted the MRI findings were consistent with impingement and AC arthritis.  Dr. Priano recommended arthroscopy, decompression and possible open distal clavicle excision of the right shoulder.  (*PageID* 302-03.)

Sweet presented to Dr. Priano on January 6, 2010 for knee problems.  Sweet's left knee MRI showed some patellar chondromalacia.  Dr. Priano offered injections, anti-inflammatory medications, and therapy, but Sweet wanted to undergo arthroscopy with possible chondroplasty.  (*PageID* 461.)  Dr. Priano performed a left knee arthroscopy with chondroplasty on January 28, 2010.  (*PageID* 407-08.)  Sweet developed a recurrence of left knee pain in September 2010.   His left knee range of motion was slightly reduced compared to his right knee.  Dr. Priano diagnosed Sweet with a recurrence of knee arthritis and provided a cortisone injection.  (*PageID* 454.)  In November 2010,  Dr. Priano found that clinically, Sweet had a meniscus tear and he ordered an MRI.  (*PageID* 453.)  The MRI of Sweet's left knee revealed a small joint space effusion, no evidence of a meniscal tear, and intact ligamentous structures. (*PageID* 463-64.)  Dr. Priano proceeded with arthroscopic chondroplasty.  (*PageID* 452.)

Bradford Mullin, M.D., F.A.C.S.  Consulting neurosurgeon, Dr. Mullin, evaluated Sweet on August 11, 2009.  Dr. Mullin noted Sweet had been treated with cortisone

shots, prednisone and Naprosyn without improvement in his neck and back pain. Dr. Mullin reviewed the MRIs and believed his bulging discs at C6-7 and C5-6 and severe central stenosis with neural foraminal changes were the source of Sweet's neck pain. Dr. Mullin did not think that the issues were surgical at that point in time, though Sweet might respond to a C5-6, C6-7 cervical discectomy, fixation and fusion, and suggested pain management and recommended a good course of conservative therapy. (*PageID* 331.)

Sweet returned to Dr. Mullin on February 23, 2010 for increasing difficulty with his neck and arms. Dr. Mullin offered an anterior cervical discectomy, fixation and fusion, C5-6, C6-7. (*PageID* 370.)

Robert Masone, M.D. Dr. Masone, a pain specialist, treated Sweet from September 2009 through January 2010 for continued pain across his cervical spine, upper back, lower back, and down the right lower extremity. (*PageID* 357-68.)

Initially, Dr. Masone reported that Sweet sat without any apparent distress and exhibited normal reflexes and muscle strength in all four extremities, a negative straight-leg raise test, and pain with hyperextension of the lumbar spine and during transition from sitting to standing. (*PageID* 363.) He diagnosed Sweet with lumbar spondylosis and cervical spondylosis, prescribed anti-inflammatory medication, and recommended physical therapy. (*PageID* 364.)

Sweet received three cervical epidural steroid injections, in October and November 2009. (*PageID* 359-61.) Sweet reported 60% relief from his injection for eight

11

hours, but that his pain returned dramatically.  (*PageID* 358.)  Dr. Masone noted that
Sweet sat without any apparent distress, had an antalgic gait, was tender to palpation
through the left lower back, and exhibited normal deep tendon reflexes in the upper
extremities, full muscle strength in the upper extremities, and good cervical range of
motion that was slightly limited at the end range.  *Id.*

In January 2010, Dr. Masone noted that conservative measures such as injections,
nerve modulating medicines, muscle relaxers, anti-inflammatories, and physical
therapy had failed, so he referred Sweet back to Dr. Mullin for further care.  (*PageID*
357.)

Myung Cho, M.D.  On October 28, 2009, Dr. Cho, a state agency physician
reviewed the record and found that Sweet could occasionally lift 20 pounds, frequently
lift 10 pounds, stand, walk and/or sit for about six hours in an eight-hour day.  (*PageID*
338.)  Dr. Cho also found that Sweet could not perform frequent overhead reaching and
could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.
(*PageID* 339-40.)  In March 2010, another state agency physician, Jerry McCloud, M.D.,
reviewed the record and affirmed Dr. Cho's opinion.  (*PageID* 381.)

Fairfield Medical Center - Physical Therapy.  Sweet participated in three physical
therapy sessions in September 2009.  (*PageID* 345-48.)  Initially, Sweet reported that his
symptoms are aggravated by sitting for a long period of time, lying on his back, and
walking.  (*PageID* 346.)  A course of four to eight weeks of physical therapy, two to three
times a week was planned.  His therapist reported that Sweet exhibited good

rehabilitation potential. *Id.* Traction did not help and after three sessions Sweet complained of increased pain and muscle tightness. (*PageID* 345.) Pool therapy was recommended but Sweet asked for treatment to be placed on hold since his doctor was ordering cortisone injections. *Id.*

Fairfield Medical Center - Emergency Department. In November 2008, Sweet presented to the emergency room complaining of chest pain going into his left arm and cramping in his legs. (*PageID* 304-17.) Sweet was admitted and underwent a cardiac catheterization which was essentially normal with mild left ventricular hypertrophy and mild mitral regurgitation. (*PageID* 311.) A lower arterial study for claudication revealed present, but weak, bilateral pulses and little hair on the lower extremities. (*PageID* 317.)

Sweet presented to the emergency room with complaints of knee pain and swelling in December 2009. (*PageID* 349-55.) Sweet was diagnosed with left knee pain, advised to elevate his leg and prescribed Naprosyn as needed and a knee immobilizer. (*PageID* 353.)

Sweet presented to the emergency room in January 2011 with a longstanding history of chronic back pain, describing his pain as "unbearable" beginning at the base of the skull and going into his tailbone. (*PageID* 505.) A CT scan taken of Sweet's cervical spine showed a mild C6-7 disc osteophyte complex causing mild bilateral neural foraminal narrowing, findings that were not significantly different from his prior imaging study. (*PageID* 512-13.) An x-ray of the lumbar spine showed mild L1 and L2

13

disc space narrowing.  (*PageID* 514.)  Sweet was diagnosed with a cervical and lumbar

strain and degenerative disc disease.  (*PageID* 508.)

Sweet was seen in the emergency room in May 2011 with complaints of right

hand pain.  (*PageID* 498.)  Sweet's upper extremities and lower extremities were all

essentially normal upon examination and he exhibited full range of motion in his knees.

(*PageID* 495.)  X-rays of Sweet's right hand were normal.  (*PageID* 502.)  Sweet was

diagnosed with right arm swelling and edema with an undetermined etiology.  (*PageID*

498.)

**Administrative Law Judge's Findings.**  The administrative law judge found that:

1.  The claimant meets the insured status requirements of the Social
    Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since July
    13, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971
    *et seq.*).

3.  The claimant has the following non-severe impairments: Disorders of the
    Skin and Cerumen Impaction (20 C.F.R. 404.1521 and 416.921).

4.  The claimant has the following severe impairments: Degenerative Disc
    Disease of the Cervical and Lumbar Spine [1], Lumbago, Sciatica, Essential
    Hypertension, Hyperlipidemia, Patellar Chondromalacia of the Knee,
    Obesity, and Edema (20 CFR 404.1520(c) and 416.920(c)).

    [footnote in decision]: [1] The claimant's back impairments have been
    variously diagnosed throughout the record and these severe back
    impairments are meant to generally encompass all diagnosed back
    conditions...

5.  The claimant does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, the [administrative law judge] finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he requires the ability to change from a sitting to a standing position (and vice versa) every thirty minutes, can only push pull with his right upper extremity on a frequent basis, can only occasionally operate foot controls with his right lower extremity, and can never climb ladders, ropes or scaffolds. Furthermore, the claimant can only occasionally climb ramps and stairs, and can only occasionally stoop, kneel, crouch, crawl, or balance. In addition, the claimant can only occasionally reach overhead with his right upper extremity, and can only frequently engage in bilateral gross manipulation and fine-finger manipulation of objects. Finally, the claimant must avoid concentrated exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. The claimant was born on February 23, 1973 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social

Security Act, from July 13, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Page ID 42-51.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Sweet argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge failed to use the appropriate legal standards in the evaluation of plaintiff's credibility.  According to plaintiff, the administrative law

judge purported to consider Sweet's testimony, but found that his alleged

limitations were more debilitating than reflected in the objective evidence and

that his alleged limitations were not consistent with his activities.  The

administrative law judge's limited analysis fails to articulate the actual weight

given to Sweet's testimony as a whole and lacks any detailed explanation of the

evidence relied upon to support the administrative law judge's view of the

plaintiff's credibility.

- The administrative law judge failed to evaluate plaintiff's IQ deficits as a severe
  impairment.  Sweet argues that he has presented objective evidence of a
  significant intellectual impairment.  Specifically, Sweet argues that the
  administrative law judge did not consider his IQ deficits despite the fact that the
  issue was raised at the hearing; because he has the requisite IQ scores; received
  services through a program for the developmentally handicapped; and
  demonstrated deficits in adaptive behavior in the areas of motor skills, social
  communication and community living skills.

**Analysis**  **Evaluation of Plaintiff's Credibility**.

Plaintiff's first claim of error finds fault with the administrative law judge's

conclusion that his testimony was not entirely credible.  Specifically, Sweet claims that

the administrative law judge failed to consider all the factors listed in Social Security

Ruling 96-7p.  With respect to plaintiff's subjective complaints of back and knee pain,

17

plaintiff alleges that the administrative law judge failed to cite to any of the factors set forth is SSR 96-7p.  (Doc. No. 12 at *PageID* 544-47.)  Plaintiff argues that his treating sources, including PA Gross and Drs. Masone and Mullin have provided objective evidence and medical opinions supporting Sweet's testimony regarding his pain and limitations.  *Id.*  Plaintiff also claims that his testimony and reports to the administration are corroborated by the objective medical evidence.  (*Id*. at *PageID* 545-46.)

"The administrative law judge's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 Fed. Appx. 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 Fed.Appx. 988, 995 (6th Cir. 2007) (declining to disturb the administrative law judge's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).

This deference extends to an administrative law judge's credibility determinations "with respect to [a claimant's] subjective complaints of pain."  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.1987)).  In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986), the Court of Appeals for the Sixth Circuit established the following test for evaluating complaints of disabling pain.  First, the Court must determine "whether there is objective medical evidence of an underlying medical condition."  If so, the Court must then

18

> examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853.

Despite this deference, "an administrative law judge's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. The administrative law judge's decision on credibility must be "based on a consideration of the entire record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Discounting credibility to a certain degree is appropriate where an administrative law judge finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. Furthermore, in assessing credibility, the administrative law judge may consider a variety of factors including "the location, duration, frequency, and intensity of the symptoms; . . . [and] the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms . . ." *Rogers*, 486 F.3d at 247.

In the instant case, the record is replete with objective medical evidence indicating that plaintiff had medically determinable impairments during the relevant period. The administrative law judge acknowledged these impairments, and further recognizes that these impairments "could reasonably be expected to produce [plaintiff's] pain or other symptoms." (*PageID* 44.) The administrative law judge determined, however, that after considering the intensity, persistence, and limiting

effect of Sweet's impairments, he was capable of light exertional work. (*PageID* 45.) In making this credibility determination, the administrative law judge properly relied on the record evidence, including objective medical findings and plaintiff's own statements about his daily activities. *See* 20 C.F.R. § 404.1529(c)(2) (objective medical findings are useful in assessing the intensity and persistence of a claimant's symptoms) and 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms).

The administrative law judge relied on the two state agency reviewing physicians, Drs. Cho and McCloud, who opined that plaintiff could perform the exertional requirements of light work, and PA Martin, who reported that plaintiff could frequently lift twenty-one to twenty-five pounds, which exceeds the lifting requirements of light work. *See PageID* 49, 319, 338-40, 381. The administrative law judge noted that the residual functional capacity is actually more restrictive than each of these opinions. (*PageID* 49.)

Dr. Masone's objective findings also provide support for the administrative law judge's credibility determination regarding plaintiff's subjective complaints of pain. plaintiff reported to Dr. Masone that his medications did not relieve his pain, yet Dr. Masone's record does not document complaints supporting his testimony that his medications caused lightheadedness and seeing spots. (*PageID* 80, 357.) There is also the issue of physical therapy. Plaintiff's statements to Dr. Masone about why he discontinued physical therapy were inconsistent with the reasons documented in the

20

physical therapy treatment records.  (*PageID* 45.)  Plaintiff told Dr. Masone "that he

discontinued physical therapy because the therapist said it would not help him."  (*Id.*,

*PageID* 362.)  However, as the administrative law judge found "the physical therapy

records . . . indicate that it was [plaintiff] who discontinued the services and there was

every indication that the therapist thought that ongoing therapy could relieve most of

[plaintiff]'s pain."  (*PageID* 45.)  As the physical therapy treatment notes show, the

physical therapist actually felt that plaintiff exhibited good rehabilitation potential.

(*PageID* 346.)  She recommended switching him to pool therapy because he complained

of pain after his first three sessions.  (*PageID* 345.)  However, plaintiff cancelled and

failed to show for his subsequent appointments, indicated that he wished to put

physical therapy on hold while he waited for approval of cortisone shots, and failed to

re-contact the physical therapy clinic about resuming therapy.  *Id.*

     Finally, the administrative law judge found that plaintiff's statements regarding

his varied activities contradict his allegations concerning the intensity, duration, and

limiting effects of his symptoms.  (*PageID* 49.)  The administrative law judge noted that

plaintiff stated that he was able to sit down and watch movies, could walk to get

around, went fishing a year ago and caught a few fish, and cooked once per week.

(*PageID* 48, 77-79.)  On a typical day, he took his dog outside for a walk that lasted

about fifteen to twenty-five minutes.  (*PageID* 76.)

     Based upon the foregoing, the Magistrate Judge finds that the administrative law

judge's assessment of plaintiff's credibility was based on consideration of the entire

record and is supported by substantial evidence.  Accordingly, applying the applicable deferential standard of review, the undersigned concludes that the administrative law judge's credibility determination was not erroneous.

### IQ deficits as a severe impairment under Listing §12.05.

Plaintiff next argues that the administrative law judge failed to evaluated his IQ deficits as a severe impairment.  According to Sweet, the objective evidence and school reports prove that he has mental limitations that cause more than a minimal degree of restriction in his ability to reason, communicate and adapt.  (*See*, Doc. No. 12 at *PageID* 547-48.)

20 C.F.R. 404.1520(c) and 416.920(c) explain that a "severe impairment" refers to an "impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." The "severe impairment" determination at step two of the sequential analysis has been characterized as a "*de minimis* hurdle.*" See Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) ("[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."); 20 C.F.R. § 404.1521(a). Although "in the vast majority of cases a disability claim may not be dismissed without consideration of the claimant's individual vocational situation.... the severity requirement may still be employed as an administrative convenience to screen out

claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 862-63.

Plaintiff argues that the administrative law judge erred in concluding that plaintiff does not suffer from a severe mental impairments -- i.e., mental retardation. The administrative law judge does not point to any evidence in the record to support this conclusion, and no doctor in the record has stated affirmatively that Sweet suffers from mental retardation. Based on the above, the Magistrate Judge is hesitant to conclude that substantial evidence supports the administrative law judge's determination that plaintiff's school records/IQ scores do not result in any additional and significant work-related limitation of function. In so determining, the Magistrate Judge does not find necessarily that plaintiff's IQ scores do result in additional functional limitations, only that the administrative law judge's findings and analysis with respect to this point may be inadequate.

However, that does not end the Court's inquiry. In order to meet Listing 12.05, plaintiff must demonstrate that he satisfies all the elements of the Listing. *See e.g., Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001); *Lawson v. Comm'r of Soc. Sec.*, 192 Fed. Appx. 521, 529 (6th Cir. 2006) (citing *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990), which stated that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify"). Defendant argues that substantial evidence supports the administrative law judge's decision that plaintiff does not meet Listing 12.05 because plaintiff has not established the requisite deficits in adaptive functioning as an adult. In support of this argument, Defendant points to evidence that between 1986 and 1989,

plaintiff's IQ scores improved; plaintiff testified that he graduated from high school and could perform basic mathematics; and Sweet worked as a truck driver, car dealership lube technician, and forklift operator, which were all semi-skilled jobs.  (*PageID* 66-67, 87, 197, 204.)  Even though the administrative law judge did not articulate the above rationale in his decision, any error with respect to this point is harmless.  The burden of showing that an error is harmful normally falls upon the party attacking the agency's decision.  *Shinseki v. Sanders*, 129 S.Ct. 1696 (2009) .

Defendant also argues that Sweet may not meet the requirements for mental retardation in the Diagnostic Statistical Manual-IV (DSM-IV).  *See*, Doc. No. 17 at *PageID* 573.  Whether or not Sweet meets the requirements of the DSM-IV is relevant to whether or not he meets Listing 12.05.  The Sixth Circuit has "recognized that Listing 12.05 tracks the Diagnostic & Statistical Manual of Mental Disorders, one of the leading texts in medicine." *Burrell v. Comm'r of Soc. Sec.*, 238 F.3d 419 (Table), 2000 WL 1827799 at *2 (6th Cir. Dec. 8, 2000) (citing *Brown v. Sec. of Health and Hum. Servs.*, 948 F.2d 268, 270 (6th Cir. 1991)).  Thus, as noted above, plaintiff must meet all of the requirements of the Listing, which include the entire diagnostic description in the introductory paragraph -- not just the portion regarding deficits in adaptive functioning -- and one of four independent sets of criteria.  *See Foster*, 279 F.3d at 353.  Accordingly, plaintiff must present evidence that he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before age 22.

24

Significant to whether or not a claimant meets the diagnostic description in Listing 12.05 is whether there is a diagnosis of mental retardation. In this case, there simply is no medical evidence supporting a severe mental impairment. There is no diagnosis of mental retardation. The most recent intelligence test scores place plaintiff in the borderline range of intellectual functioning. (*PageID* 197.) The record shows that Sweet exhibited normal thought content, cognition, memory, concentration, abstract thinking, judgment, and insight. (*PageID* 286, 435, 437.)

In showing that he meets the requirements of Listing 12.05, plaintiff cannot merely rely upon omissions in the administrative law judge's written decision because it is his burden to establish that he satisfies all of the elements of the Listing. *See Foster*, 279 F.3d at 353.

Based on the above, the Magistrate Judge concludes that plaintiff has failed to demonstrate

that he satisfies the diagnostic description in Listing 12.05's introductory paragraph. Since plaintiff has failed to make this showing, plaintiff has not met his burden, and the Court must uphold the conclusion of the administrative law judge with respect to this issue.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.** It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

                                         s/Mark R. Abel
                                        United States Magistrate Judge